UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | No. 1:24-cr-17 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| DEWAYNE LEE WILLIAMS | ) | |

**M E M O R A N D U M**

This matter is before the Court on the report and recommendation (the "R&R") of Magistrate Judge Susan K. Lee recommending the Court deny Defendant's amended motion to suppress evidence against him. (Doc. 51.) Defendant objects to several of the Magistrate Judge's findings of fact and conclusions of law and requests the Court to schedule oral argument to "aid resolution of this pretrial issue." (Doc. 58 at 1.) The United States ("the Government") opposes the objections and argues oral argument is unnecessary. (Doc. 60).

The Court has reviewed the transcript of the evidentiary hearing before the Magistrate Judge, the exhibits introduced at the hearing, and the briefs the parties filed before and after the R&R issued. Due to the comprehensive record, the Court determines oral argument is unnecessary in this case. The Defendant's objections to the R&R (Doc. 58) will be **OVERRULED**, the R&R (Doc. 51) will be **ADOPTED in part and MODIFIED in part**, and Defendant's amended motion to suppress (Doc. 27) will be **DENIED**.

I. **BACKGROUND**

The R&R begins with a detailed summary of the procedural and factual history and the testimony provided by the witness at the suppression hearing. (Doc. 51 at 2–11.) The following summary of the factual background is derived from the R&R and the evidence presented at the

evidentiary hearing held on October 1, 2024. Defendant objects to two factual findings in this portion, which the Court will address in the Discussion section below.

The incident at issue started with a 911 call from Mr. Gregory Wilson on December 2, 2023, around 5:30 p.m. Wilson reported that a male was trying to break into his apartment at 502 Latimore Street in Chattanooga, Tennessee, which was scaring him and his three young children. During the 911 call, Wilson denied knowing the suspect and stated he was unsure of the suspect's race and clothing. Based on this call, the Chattanooga Police Department ("CPD") dispatched a burglary-in-progress at the address. The 911 dispatcher stayed on the phone with Wilson until law enforcement arrived. Around two minutes into the call, the dispatcher asked Wilson if he still heard the suspect at the door; and Wilson said, "Yes, sir." Wilson stated that it sounded like the suspect was "kicking the door." About three minutes and forty-five seconds into the 911 call, the sound of loud pounding can still be heard. Less than thirty seconds later, the dispatcher informed Wilson that there were "some officers pulling up right now."

CPD officers, Mark Dagostino and Adam Williams, arrived at the address within minutes of the dispatch. The first officer to arrive, Officer Dagostino, stopped his patrol car near 502 Latimore Street at 17:47:14. He arrived within thirty seconds of the time the 911 dispatcher could hear pounding at Wilson's door. At 17:47:18, four seconds after his arrival, Officer Dagostino yells, "Hey bud, come here," at the only person in close proximity to 502 Latimore Street. This person was later identified as Defendant.

When Officer Dagostino called out to Defendant, Defendant did not immediately turn to walk toward Officer Dagostino; instead, he kept walking adjacent to the apartment complex. In the span of about four seconds, Officer Dagostino told Defendant to "come here" two more times but Defendant did not do so. Shining his flashlight on Defendant, Officer Dagostino walked up a

2

wet, grassy, and muddy slope and met Defendant at the top beside the apartment complex, again saying, "Come here!" Defendant, in response, turned toward Officer Dagostino and asked why he was being stopped. Officer Dagostino did not answer.

Within seconds of Officer Dagostino's arrival, Officer Williams parked in the apartment complex about thirty yards from the address and began a rapid approach on foot to Officer Dagostino and Defendant. At 17:47:21, Officer Williams also yelled "Come here!" in the direction of Defendant. At 17:47:27, a handgun is visible in the right hand of Officer Williams. Officer Williams continued to shout, "Come here!" Officer Williams testified he drew his weapon within seconds of his arrival because the location was a high-crime area known for carjackings, burglaries, thefts, and shootings.

The officers and Defendant physically intersected around 17:47:29, when Officer Dagostino grabbed Defendant's left sleeve and Officer Williams reached for Defendant's right arm. Defendant continued to question why he was being "arrested." Officer Williams testified that as he grabbed Defendant's arm to conduct an investigatory detention, Defendant raised and pulled it away. Officer Williams interpreted this as Defendant attempting to flee. Because Officer Williams lost his grip on Defendant's arm, he then wrapped his arms around Defendant to stop his flight. They both fell to the ground in the slippery mud where they were standing. Officer Williams yelled, "get on the f**king ground, boy."

Immediately after Defendant is on the ground, Officer Williams ordered Defendant to stop moving so he could handcuff him. Defendant repeatedly asked the officers what he did wrong and why he was under arrest. Within seconds, at 17:48:09, Officer Williams responded, "I'm gonna explain that to you, but stop f**king pulling away from us when we go to put you in handcuffs—

3

do you understand me?" Defendant replied, "Alright yes sir, yes sir, I'm not doing anything." Officer Williams handcuffed Defendant and then called Defendant a "f**king idiot!"

A few seconds later, at 17:48:16, Officer Williams asked Defendant if he had anything on him. Defendant initially responded no. Officer Williams then said, "No weapons?" and Defendant replied, "Yes sir." Officer Williams, in response, stated, "Huh?" and Defendant reiterated, "Yes, sir." Officer Williams asked "Where?" and Defendant said, "in my bag," which Defendant was still wearing. Officer Williams told Defendant to stand up and he assisted Defendant off the ground.

As Defendant stood up, Defendant again asked, "Why are you all doing me like this for?" and, around 17:48:27, Officer Williams said, "Because you f**king pulled away from me." Defendant responds, "Cuz I don't know what I'm doing . . . I ain't doing s**t." Immediately, at 17:48:31, Officer Williams responded by telling Defendant to "listen to instruction when you're given it and then you're not gonna to get all muddy." Officer Williams then took Defendant down to the front of the police cruiser. At this time, Officer Williams removed the single strap, sling-style backpack from Defendant's person and placed it on the hood of the car.

Seconds later, Officer Williams used his flashlight to look in the bag and saw a firearm and marijuana. At 17:49:09, Defendant said, "That's registered," presumably referring to the firearm in his backpack. Officer Williams then put his flashlight away and closed the backpack and continued to wipe mud from his hands and uniform. He asked Defendant for identification and Defendant acknowledged that it was in his wallet, which was on the hood of the police cruiser by this time.

Officer Williams then conducted a warrantless, full custody search of Defendant's backpack and found a handgun, marijuana, and scales. Based on this search, Defendant was

4

indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 1.) Defendant filed a motion, an amended motion, and two supplements to suppress Defendant's statements during custodial questioning and the items seized from the backpack. (Doc. 25; Doc. 27; Doc. 36; Doc. 40.)

The Magistrate Judge held a hearing on Defendant's motion to suppress on October 1, 2024. (Doc. 47.) In her R&R, issued pursuant to 28 U.S.C. § 636(b)(1)(B), Magistrate Judge Lee found that officers had reasonable suspicion to seize Defendant, officers conducted a *Terry* stop rather than an arrest when they first seized Defendant, and officers had probable cause to arrest Defendant for resisting detention. (Doc. 51.) The R&R accordingly recommended the amended motion to suppress (Doc. 27) be denied. (Doc. 51 at 46.) Defendant timely filed objections to the R&R (Doc. 58) and the Government responded (Doc. 60).

## II. STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R or the specified proposed findings or recommendations to which objection is made. 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court to rehear witnesses whose testimony has been evaluated by the Magistrate Judge. *See United States v. Raddatz*, 447 U.S. 667, 675–76 (1980). "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on the magistrate's proposed findings and recommendations." *Id.* at 676. The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting him or her in the best position to determine credibility. *See Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

5

In resolving objections, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

### III. **DISCUSSION**

First, Defendant objects to the Magistrate Judge's factual findings that (1) "Officer Dagostino arrived less than [thirty] seconds of the time the dispatcher could hear pounding at Wilson's door during the 911 call" and that (2) "four seconds after his arrival, Officer Dagostino yells, "Hey bud, come here," at *the only person in close proximity to 502 Latimore Street*, who is later identified as the defendant, a black male." (Doc. 58 at 1–3 (quoting Doc. 51 at 4) (alteration in original).) Second, Defendant objects to the Magistrate Judge's legal conclusions that (1) officers had sufficient facts for reasonable suspicion to seize Defendants; (2) officers were attempting a *Terry* Stop instead of an arrest; and (3) officers had probable cause to arrest Defendant for resisting detention. (*Id*. at 3–17.) Defendant also challenges Officer Williams's credibility.

Because the facts depend on the testimony of Officer Williams, the Court will first address the challenge to Officer Williams's credibility. The Court will then address the objections to the factual findings, followed by the objections to the legal conclusions.

#### A. **Whether the R&R erroneously concluded Officer Williams was credible**

Defendant argues that the R&R erred in "casually dismissing" and "[c]asting [a]side the [c]redibility [i]ssues of Officer Williams." (*Id*. at 13, 15.) He challenges the R&R's conclusion that the video footage supports Officer Williams's version of the event. (*Id*. at 13.) He suggests that contrary to Officer Williams's testimony, "[t]he video shows an immediate and violent takedown of [Defendant]." (*Id*.) Defendant also argues that Officer Williams made

6

misrepresentations under oath that "greatly impugn" his credibility. (*Id*. at 15.) For example, Officer Williams did not include in his initial report that he "put both hands around [Defendant]." (*Id.* (quoting Doc. 47 at 93).) Officer Williams also included a description of a suspect in his sworn affidavit that he never had. (*Id.* (citing Doc. 47 at 98–99).) Further, Defendant challenges Officer Williams's credibility by offering the other officers' statements "congratulating Officer Williams on his successful takedown of Defendant." (*Id*. at 16.)

Magistrate Judge Lee considered these same arguments in making her credibility determination. (Doc. 51 at 20–26.) She nonetheless found Officer Williams's testimony to be credible. She first determined that the video footage supported Officer Williams's version of the event.

> While the [c]ourt has heard argument about Defendant's interpretation of the video footage, Defendant did not present evidence to indicate Officer Williams is not a reasonable officer or that a reasonable officer would not view Defendant's arm movement as an attempt to flee. The footage does not obviously discredit Officer Williams's testimony, which was informed by his training and experience with suspects in burglary-in-progress calls. He never wavered in his testimony that the arm raising/pulling maneuver by Defendant was an attempt to flee. . . . Contrary to Defendant's arguments, the comments in the footage mostly, if not entirely, support Officer Williams's version of the event.

(Doc. 51 at 22–23.) She then addressed Defendant's remaining concerns and determined they did not undermine Officer Williams's credibility.

> During the hearing, no proof was addressed at explaining why Officer Williams included the description of a 'skinny black man' in his Affidavit of Complaint. I acknowledge it is an error in the document, and I have taken it into consideration in my credibility determination. Even considering this noted error, alone and in combination with other proof and Defendant's arguments and the officers' use of force (and downplaying same), the bravado and congratulations of the fellow officers, and the footage of the events, I do not find these considerations undermine Officer Williams's credibility concerning his reasonable conclusion as a trained police officer that Defendant was not submitting to the officers' efforts to put his hands behind his back to detain him in a *Terry* stop.

(Doc. 51 at 25.)

7

Higher courts are "generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor." *Peveler v. United States,* 269 F.3d 693, 702 (6th Cir. 2001). Here, the Magistrate Judge addressed Defendant's arguments and provided a well-reasoned explanation for why she found Officer Williams to be credible. (*See* Doc. 51 at 20–26.) The Magistrate Judge's credibility determination is entitled to deference because she was in the best position to observe and hear Officer Williams's testimony and assess his demeanor at the suppression hearing. *See Irorere*, 69 F. App'x at 236; *United States v. Davis*, No. 1:21-CR-110, 2022 WL 2438843, at *2 (E.D. Tenn. July 5, 2022). Moreover, after conducting a *de novo* review of the record, including Officer Williams's testimony and the body-camera footage, the Court finds no reason to question the Magistrate Judge's credibility assessment. *See United States v. Bowman,* No. 1:10-CR-68, 2011 WL 294289, at *4 (E.D. Tenn. Jan. 27, 2011). Accordingly, Defendant's objection to the Magistrate Judge's finding that Officer Williams testified credibly is **OVERRULED**.

> **B. Whether the R&R erroneously found that Officer Dagostino arrived less than thirty seconds after the time the dispatcher could hear pounding at the door during the 911 call**

Defendant objects to the finding that "Officer Dagostino arrived less than [thirty] seconds of the time the dispatcher could hear the pounding at Wilson's door during the 911 call." (Doc 58 at 1 (quoting Doc. 51 at 4).) Noting that the 911 audio does not contain timestamps, Defendant argues that the R&R made faulty assumptions to conclude that Officer Dagostino actually arrived on the scene within thirty seconds of the purported pounding. (*Id*. at 2.) Defendant suggests that the dispatcher's statement that there were "some officers pulling up right now" "does not necessarily indicate that the officers were in the very near vicinity and close enough to immediately observe a person that they eventually found to be [Defendant]." (*Id*. at 2.)

8

Case 1:24-cr-00017-CLC-MJD   Document 62   Filed 03/18/25   Page 8 of 20   PageID #: 569

After conducting a *de novo* review, the Court disagrees.[1] Three minutes and forty-five seconds into the 911 call, the dispatcher could hear loud pounding over the phone. (Doc. 37-1.) Four minutes and five seconds into the 911 call, less than thirty seconds later, the dispatcher informed Wilson that officers were pulling up. (*Id.*) Officer Williams testified that this meant he was pulling up to 502 Latimore Street at that time, which was seconds after Officer Dagostino arrived. (Doc. 47 at 31, 40.) As explained above, the Magistrate Judge's determination that Officer Williams is credible is given deference. *See Irorere*, 69 F. App'x at 23. Therefore, the Court finds that the dispatcher's statement was made contemporaneously with the officers pulling up to the scene.

Further, Officer Dagostino's body camera shows him driving and stopping in the parking lot right in front of Wilson's apartment. (Doc. 27-2 at 17:47:17.) Upon Officer Dagostino's arrival and departure out of his vehicle, Defendant is seen walking in the opposite direction of Wilson's apartment. (*Id.* at 17:47:18.) Defendant even admits that at the time of the officers' arrival, the officers could view the front of 502 Latimore Street and the adjacent units. (Doc. 58 at 3.) Accordingly, when the officers pulled up to the address, they were in the near vicinity and close enough to observe a person that they eventually found to be Defendant. For these reasons, Defendant's objection to this factual finding will be **OVERRULED.**

### C. Whether the R&R erroneously found that Defendant was the only person in close proximity to the address

Defendant next objects to the finding that "four seconds after his arrival, Officer Dagostino yells, "Hey bud, come here,"" at *the only person in close proximity to 502 Latimore Street*, who is

---

[1] The Government contends the Court is to review the Magistrate Judge's factual findings for clear error. (Doc. 60 at 3.) However, the Court conducts a *de novo* review of all portions of the R&R to which objection is made. *See* 28 U.S.C. § 636(b)(1)(C). Nonetheless, the Court gives deference to the Magistrate Judge's assessment of witnesses. *See Irorere*, 69 F. App'x at 236.

later identified as the defendant, a black male." (Doc. 58 at 3 (quoting Doc. 51 at 4) (alteration in original).) Defendant contends that "[a]t the time of Officer Dagostino's arrival, the officers could only view the front of 502 Latimore Street and the adjacent units; they could not view the portion of the property *behind* the townhomes—the direction in which an attempted burglar would most likely have run upon police cars entering the cul-de-sac." (*Id*. at 3.)

The Court will **MODIFY** the factual finding to the extent that Officer Dagostino yelled, "Hey bud, come here," at the only person he sees in close proximity to 502 Latimore Street, who is later identified as the defendant, a black male.

### D. Whether the R&R erroneously concluded that officers had reasonable suspicion to seize Defendant

Defendant objects to the Magistrate Judge's conclusion that the officers had reasonable suspicion to perform a *Terry* stop. (*Id*. at 3–5.) Defendant first argues that the Magistrate Judge erroneously "dismiss[ed] the applicability of *United States v. Evans*, 947 F.Supp.2d 895 (E.D. Tenn. 2013)." (*Id.* at 3.)

In *Evans*, officers were dispatched to a high crime area after two people called 911 about "a suspicious male with a gun." 947 F.Supp.2d at 898. Based on the calls, officers were given a description of the suspect and his whereabouts. *Id*. Officers saw an individual walking in the general vicinity described and approached him to ask questions. *Id*. Although the individual only matched a couple of the physical characteristics of the suspect, an officer performed a *Terry* stop and frisk on him. *Id*. The court suppressed evidence discovered during the frisk, finding officers lacked reasonable suspicion that the defendant committed a crime primarily because "the two 911 calls asserted no illegal activity." *Id*. The court noted the "mere fact that defendant was in the immediate area . . . and matched a couple of the given physical descriptions did not supply

10

reasonable suspicion for the officers to immediately restrain him and demand a pat-down absent some information that he had or was about to commit a criminal act." *Id*. at 898–99.

The Magistrate Judge found that Defendant's reliance on *Evans* was "misplaced" because unlike in that case, "the CPD officers had strong information from which they reasonably concluded a crime was occurring." (Doc. 51 at 29, 31 (citing *Navarette v. California*, 572 U.S. 393, 398–400 (2014).)  The R&R states,

> I conclude this case differs from *Evans* because the officers here had strong facts to conclude a dangerous crime in a high crime area was presently occurring as reported by Wilson, a present and identified eyewitness.  Wilson's account was corroborated at least partially by the dispatcher, who heard pounding on the door less than [thirty] seconds before the officers arrived; and, when they arrived, Defendant was the only male/person in close proximity to, and walking away from the direction of, Wilson's apartment.  This is sufficient for an investigatory stop.

(*Id.* at 30.)

Defendant explains that he cited *Evans* to demonstrate a lack of reasonable suspicion here because Defendant did not match any of the known descriptions of the suspect and was merely walking in the vicinity of the alleged crime. (Doc. 58 at 3–4.)  Defendant also argues that officers did not have reasonable suspicion to believe a crime was occurring or that Defendant was the person committing the crime.  (*Id*. at 5.)  Defendant suggests that although the dispatcher heard pounding, "knocking on a person's door is not a crime," and officers never observed Defendant committing a crime.  (*Id*. at 4.)  Accordingly, Defendant argues that the R&R erroneously found that the officers had reasonable suspicion to perform a *Terry* stop. (*Id*. at 4–5.)

In response, the Government argues that the officers had reasonable suspicion.  (Doc. 60 at 5.)  The Government suggests that "based on the collective knowledge doctrine, the dispatcher's detailed and contemporaneous information, and the defendant's suspicious actions near the crime scene, the CPD had reasonable suspicion—if not probable cause—to conduct a *Terry* stop." (*Id*.

at 7–8.)  It argues the slight inconsistencies in the description did not invalidate the officers' reasonable suspicion.  (*Id*. at 7 (quoting *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000)).)

The Fourth Amendment prohibits "unreasonable . . . seizures" to protect "[t]he right of the people to be secure in their persons."  U.S. Const. amend. IV.  It is well established that "[u]nder the Fourth Amendment, there are three types of permissible encounters between police and citizens: consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion;' and arrests which must be based on probable cause."  *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (quoting *United States v. Bueno,* 21 F.3d 120, 123 (6th Cir. 1994)).

A *Terry* stop requires "'reasonable suspicion.'"  *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968)).  "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot."  *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013) (quoting *United States v. Young*, 707 F.3d 598, 604–05 (6th Cir. 2012)).  The Court must determine the officers' collective knowledge at the time the defendant was seized, *see United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012), and "look at the aggregate, not each factor or consideration in isolation."  *United States v. Keeling*, 783 F. App'x 517, 521 (6th Cir. 2019).

"In examining the totality of the circumstances . . . the officer's reasonable suspicion need not arise exclusively from his own direct observations."  *Dorsey*, 517 F.3d at 395.  "Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers."  *Id.* (citing *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006)).  "[I]nformation relayed from the police dispatcher is imputed to the individual officers" in "determining the reasonableness

12

Case 1:24-cr-00017-CLC-MJD   Document 62   Filed 03/18/25   Page 12 of 20
PageID #: 573

of a *Terry* stop." *United States v. Farrington*, 795 F. App'x 404, 409 n.3 (6th Cir. 2019). It also "involves commonsense judgments and inferences about human behavior, as well as inferences the officer may draw based on his experience and specialized training." *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022) (citations and quotation marks omitted) (noting innocent behaviors may establish reasonable suspicion in some circumstances).

Defendant suggests knocking on a person's door is not a crime, (Doc. 58 at 4), however Wilson did not interpret this sound as mere knocking and he and his children were afraid. Wilson called 911 and identified himself, his address, and his concern to the dispatcher. The dispatcher, who also heard the pounding over the phone, reasonably interpreted this as a burglary in progress, which was then relayed to the officers. The information from the dispatcher is imputed to the officers in determining the reasonableness of the *Terry* stop. *Farrington*, 795 F. App'x at 409 n.3. Relying on the burglary-in-progress dispatch, the officers arrived on the scene within minutes, and once at the scene, the officers made commonsense judgments and inferences based on human behavior and their own experience and specialized training. *See United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022).

Officer Williams had been working for CPD for almost seven years. (Doc. 47 at 26.) He knew 502 Latimore Drive to be a high-crime address and had responded to various crimes in that area before, including "[b]urgalries, people being shot, carjackings, [and] auto thefts." (*Id*. at 28.) While Defendant's presence in a high-crime area is not enough to support reasonable suspicion standing alone, *see United States v. Bloodworth*, 798 Fed. App'x 842, 846 (6th Cir. 2019), dispatch informed officers that there was a burglary in progress at the address. *See Dorsey*, 517 F.3d at 395. Officer Williams testified that this meant the crime was actively happening as officers were arriving on the scene. (Doc. 47 at 45.) The officers arrived on the scene within minutes and

13

Defendant was the only person they observed in the proximity of the alleged criminal activity. *Compare Evans*, 947 F.Supp.2d at 898 (finding that 911 calls did not create reasonable suspicion where no criminal activity was alleged). Defendant's evasive actions when asked to stop only contributed to the officers' reasonable belief that Defendant was trying to avoid an encounter with police. *See United States v. Stittiams*, 417 F. App'x 530, 536 (6th Cir. 2011).

Even if Defendant was merely knocking on Wilson's door as he contends, officers do not have to eliminate all innocent behaviors for there to be reasonable suspicion. *McCallister*, 39 F.4th at 374. Given the totality of the circumstances, the Court finds that officers had reasonable suspicion to believe a crime was occurring and that Defendant was the person committing the crime. *See Keeling*, 783 F. App'x at 521. Although the Court acknowledges Defendant's reasons for citing *Evans*, 947 F.Supp.2d 895, such as highlighting the description's lack of specificity, the dispatch information, the officers' observations at the scene, and Defendant's "'temporal and physical proximity to the reported crime' sufficed to form reasonable suspicion that [Defendant] was the person [Wilson] had observed." *See Harrod v. Lee*, No. 24-5228, 2024 WL 5103834, at *3 (6th Cir. Dec. 13, 2024) (quoting *United States v. Atkins*, 513 F. App'x 577, 580 (6th Cir. 2003)). Differences in the description did not defeat the officer's reasonable suspicion here. *See, e.g., United States v. Paul,* No. 2:21-cr-00112, 2022 WL 15085634, at *3 (E.D. Tenn. Oct. 26, 2022), *aff'd*, No. 23-5241, 2024 WL 891611 (6th Cir. Mar. 1, 2024).

Therefore, the Court will **OVERRULE** this objection and **ADOPT** the Magistrate Judge's finding that there was reasonable suspicion to seize Defendant.

### E. Whether the R&R erroneously concluded that officers were attempting a *Terry* stop instead of an arrest

Next, Defendant objects to the Magistrate Judge's conclusion that officers were attempting a *Terry* stop rather than an arrest. (Doc. 58 at 5–12.)

First, Defendant argues that the R&R erroneously concluded "that [Defendant] was 'not seized until he was physically apprehended in handcuffs.'" (*Id*. at 6 (quoting Doc. 51 at 26).) He suggests that the Magistrate Judge incorrectly relies on *California v. Hodari D*., 499 U.S. 621, 626 (1991) and Sixth Circuit precedent to determine when Defendant was seized. (*Id*. at 6–7.) Defendant contends he was seized at the moment Officer Williams displayed a firearm because "no reasonable person in his position would feel as if they could voluntarily cease contact with these officers." (*Id*. at 9.)

For an individual to be seized under the Fourth Amendment, an officer must have applied "'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)); *United States v. Phillips*, 677 F. App'x 294, 295 (6th Cir. 2017). However, "[t]here is no seizure without that person's actual submission," *Brendlin v. California*, 551 U.S. 249, 254 (2007), meaning a suspect postpones the point of seizure by failing to comply with an officer's initial show of authority. *See Hodari D*., 499 U.S at 626. For example, fleeing can prevent a seizure from taking place or end a seizure that has already begun. *United States v. Johnson*, 631 F. App'x 299, 303 (6th Cir. 2015) (finding that the seizure was terminated when the defendant tried to flee after officers tried to handcuff him).

Although Officer Williams testified that he never pointed the gun at Defendant (Doc. 47 at 51), there was certainly a show of authority by raising the gun. *See Hodari D*., 499 U.S at 626. The question, however, is whether Defendant submitted to that show of authority. *See Johnson*,

15

631 F. App'x at 303. Within seconds of Officer Williams holding the gun, the officers attempted to detain Defendant to conduct an investigatory stop. (Doc. 27-2 at 17:47:27–17:47:32.) After some evasive behavior, Defendant eventually turned to face the officers (*id*. at 17:47:30), but there was quickly a struggle to successfully detain Defendant (*id*. at 17:47:30–17:47:55).

According to the R&R, "Officer Williams testified that as he tried to put Defendant's right arm behind Defendant's back, Defendant raised his arm and pulled it away from Officer Williams's grip." (Doc. 51 at 19.) After thorough consideration of the evidence, the Magistrate Judge determined Officer Williams testified credibly as to Defendant pulling and raising his arm to flee. (*Id*. at 23.) Giving due deference to the Magistrate Judge's credibility determination, *see United States v. Vaughn,* 429 F. Supp. 3d 499, 509 (E.D. Tenn. 2019), the Court finds that by pulling up and raising his arm, Defendant did not submit to officers' authority, thereby postponing the point of seizure. *See Hodari D*., 499 U.S at 626; *Johnson*, 631 F. App'x at 303. Thus, the Court agrees that the point of seizure was when Defendant was physically apprehended in handcuffs. Accordingly, the Court will **OVERRULE** Defendant's objection on this ground.

Defendant also argues that the officers lacked articulable facts warranting the use of handcuffs for a *Terry* stop. (Doc. 58 at 10–12.) Defendant contends the R&R erred by giving undue weight to the high-crime-area factor. (*Id*. at 12.) Defendant argues that even if the location was in a high-crime area, officers still were unjustified in their use of handcuffs because they lacked articulable facts suggesting Defendant was armed or dangerous, especially after Defendant "submitted to their show of authority and was engaging with the officers in a nonviolent manner." (*Id*.) For these reasons, he claims the officers performed a custodial arrest rather than a *Terry* stop. (*Id*.) The Government responds by arguing the officers' actions remained within the bounds of *Terry* because they "reasonably believed [Defendant] was involved in an ongoing burglary, and

16

his resistance further justified the use of handcuffs to ensure officer safety while detaining him."
(Doc. 60 at 9.)

The Sixth Circuit has held that "officers may handcuff someone during a *Terry* stop without transforming the interaction into an arrest 'if the circumstances warrant the precaution.'" *Harrod*, No. 24-5228, 2024 WL 5103834, at *2. "For example, if officers know 'specific facts' suggesting a person they've *Terry*-stopped 'poses a risk of flight or of violence to the officers,' they can apply handcuffs." *Id*. (quoting *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015)). The scope of the investigative stop depends on "the circumstances that originally justified the stop," *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002), and whether officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Smith*, 594 F.3d 530, 537 (6th Cir. 2010) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

Here, Defendant was a suspect of a burglary in progress that took place at night in a high-crime area. Because of the serious nature of the crime of burglary, an officer with reasonable suspicion may also reasonably assume that the suspect is armed and dangerous. *See Hurst*, 228 F.3d at 758 n.3. In fact, Officer Williams testified that he had experience and knowledge that suspects in ongoing burglaries are often violent, attempt to harm officers, and attempt to flee. (Doc. 47 at 51.) Therefore, it was not unreasonable or otherwise improper for the officers to handcuff Defendant as a precautionary measure to secure their safety. *See Hurst*, 228 F.3d at 758 n.3. This is especially true because the suspected ongoing burglary was occurring in the dark in a location the officers knew to be dangerous and Defendant's behavior was initially evasive. *See*

*McCalliste*r, 39 F.4th at 376 (finding that an officer's knowledge about frequent shootings in the area contributed to the reasonable suspicion that the defendant was armed and dangerous).

For these reasons, the use of handcuffs did not automatically transform the *Terry* stop into a custodial arrest because this intrusive measure was warranted by the circumstances. *See Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015). Despite Defendant's contention, the officers were not required to conduct reasonable inquiries commensurate with a *Terry* stop before handcuffing Defendant as long as they "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *See Smith*, 594 F.3d at 537. Thus, the Court will also **OVERRULE** Defendant's objection on these grounds.

Accordingly, the Court will **ADOPT** the Magistrate Judge's finding that the officers preformed a *Terry* stop rather than a custodial arrest.

### F. Whether the R&R erroneously concluded that probable cause developed to arrest Defendant for resisting arrest

Lastly, Defendant objects to the Magistrate Judge's conclusion that probable cause developed to arrest Defendant. (Doc. 58 at 12–17.) Specifically, Defendant argues that the R&R "err[ed] in finding that officers 'attempted to seize [Mr. Williams] to investigate further' but he engaged in 'evasive actions' that provided probable cause to a different crime: resisting arrest." (*Id.* at 12 (quoting Doc. 51 at 36–37) (alteration in the original).) He primarily criticizes that the R&R's finding regarding resistance "mainly derive[d] from its credibility determination of Officer Williams." (*Id.* at 13.) Defendant also argues that the R&R improperly concluded that he was resisting based on his own statements and his failure to deny that he pulled away. (*Id.* at 16.)

The Government argues "Defendant's immediate resistance to officers' verbal commands and his evasive actions—pulling his arm away—were captured on body camera and establish that

he was attempting to avoid detention, which supports the officers' decision to arrest him for disorderly conduct and resisting." (Doc. 60 at 8.)

According to Tennessee Code Annotated § 39-16-602(a), "[i]t is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another." Officer Williams testified that as he tried to put Defendant's right arm behind Defendant's back to investigate him further, Defendant raised his arm and pulled it away from Officer Williams's grip. (Doc. 51 at 18.) The R&R states, "I find the credible evidence supports that the officers had reasonable suspicion for a *Terry* stop to investigate the burglary-in-progress report that then ripened into probable cause once Defendant resisted." (*Id*. at 37 n.18.) As explained above, the Magistrate Judge's determination that Officer Williams is credible is given deference. *See Irorere*, 69 F. App'x at 23.

Further, the record evidence does not cause the Court to question the Magistrate Judge's credibility assessment. *See Bowman,* No. 1:10-CR-68, 2011 WL 294289, at *4. The slowed-down body camera supports the finding that Defendant pulled his arm away (Doc. 27-2 at 17:47:31–32), and less than two minutes after Defendant was taken to the ground, Officer Dagostino explained to Officer Smith that Defendant was preparing to run and pulling away when he was stopped (Doc. 27-2 at 17:49:17.) While Defendant's own statements do not clearly indicate that he was resisting, they also do not refute Officer Williams's testimony that he believed Defendant was attempting to flee. Therefore, the Court will **OVERRULE** Defendant's objection and **ADOPT** the Magistrate Judge's finding that at the time Defendant was successfully placed in handcuffs, the officers had probable cause to arrest Defendant for resisting detention.

## IV. CONCLUSION

Due to the comprehensive record, the Court determines oral argument is not necessary in this case. For the reasons stated above, the Defendant's objections to the R&R (Doc. 58) will be **OVERRULED**, the R&R (Doc. 51) will be **ADOPTED in part and MODIFIED in part**, and Defendant's amended motion to suppress (Doc. 27) will be **DENIED**.

**AN APPROPRIATE ORDER WILL ENTER.**

/s/
**CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE**